**William H. DORAN, Jr.,**
**Plaintiff-Appellant,**

v.

**PETROLEUM MANAGEMENT CORP.,**
**Morton A. Sterling and O. W. Fauntleroy, Defendants-Appellees.**

No. 74–3972.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1977.

Rehearings Denied March 4, 1977.

Robert L. Ramsey, Dallas, Tex., for plaintiff-appellant.

Pat S. Holloway, Dallas, Tex., for defendants-appellees.

Before GOLDBERG, DYER and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case a sophisticated investor who purchased a limited partnership interest in an oil drilling venture seeks to rescind. The question raised is whether the sale was part of a private offering exempted by § 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) (1970), from the registration requirements of that Act. *See* Securities Act of 1933, §§ 5, 12(1), 15 U.S.C. §§ 77e, 77 *l*(1).[1] We hold that in the absence of findings of fact that each offeree had been furnished information about the issuer that a registration statement would have disclosed or that each offeree had effective access to such information, the district court erred in concluding that the offering was a private placement. Accordingly, we reverse and remand.

I. Facts

Prior to July 1970, Petroleum Management Corporation (PMC) organized a California limited partnership for the purpose of drilling and operating four wells in Wyoming. The limited partnership agreement provided for both "participants," whose capital contributions were to be used first to pay all intangible expenses incurred by the partnership, and "special participants," whose capital contributions were to be applied first to pay tangible drilling expenses.[2]

---

1. Section 4(2), 15 U.S.C. § 77d(2), provides that the registration requirements in § 5, 15 U.S.C. § 77e, shall not apply to "transactions by an issuer not involving any public offering." The SEC's adoption of Rule 146, 17 C.F.R. § 230.146 (1976), which establishes a sufficient set of conditions for coming within the exemption, does not bear directly on the case at bar. The transaction at issue began in 1970, and the plaintiff filed suit in 1972. Rule 146 was not adopted until 1974. It applies to offers commencing on or after June 10, 1974.

2. Portions of a "participant's" contribution could be applied to tangible expenses only if the "special participants'" contributions had been exhausted and the "participants'" contributions exceeded the partnership's total intangible drilling expenses. Both intangible and tangible expenses were to be charged first to the proceeds of production, and any excess charged to the capital accounts of the "partici-

PMC and Inter-Tech Resources, Inc., were initially the only "special participants" in the limited partnership. They were joined by four "participants." As found by the district court, PMC contacted only four other persons with respect to possible participation in the partnership. All but the plaintiff declined.

During the late summer of 1970, plaintiff William H. Doran, Jr., received a telephone call from a California securities broker previously known to him. The broker, Phillip Kendrick, advised Doran of the opportunity to become a "special participant" in the partnership. PMC then sent Doran the drilling logs and technical maps of the proposed drilling area. PMC informed Doran that two of the proposed four wells had already been completed. Doran agreed to become a "special participant" in the Wyoming drilling program. In consideration for his partnership share, Doran agreed to contribute $125,000 toward the partnership. Doran was to discharge this obligation by paying PMC $25,000 down and in addition assuming responsibility for the payment of a $113,643 note owed by PMC to Mid-Continent Supply Co. Doran's share in the production payments from the wells was to be used to make the installment payments on the Mid-Continent note.

Pursuant to this arrangement, on September 16, 1970, Doran executed a promissory note, already signed by the President and Vice President of PMC in their individual capacities, for $113,643 payable to Mid-Continent. On October 5, 1970, Doran mailed PMC a check for $25,000. He thereby became a "special participant" in the Wyoming drilling program.

On July 16, 1971, the balance on the note to Mid-Continent became due. The parties renegotiated the loan. A new note for $66,292.24 was executed by PMC, the two PMC officers, and Doran. Pursuant to a written agreement of February 9, 1971, however, Doran had agreed to hold PMC and its officers harmless for any liability arising from the Mid-Continent note. The July renegotiation did not alter Doran's obligation.

During 1970 and 1971, PMC periodically sent Doran production information on the completed wells of the limited partnership. Throughout this period, however, the wells were deliberately overproduced in violation of the production allowances established by the Wyoming Oil and Gas Conservation Commission. As a consequence, on November 16, 1971, the Commission ordered the partnership's wells sealed for a period of 338 days. On May 1, 1972, the Commission notified PMC that production from the wells could resume on August 9, 1972. After August 9, the wells yielded a production income level below that obtained prior to the Commission's order.

Following the cessation of production payments between November 1971 and August 1972 and the decreased yields thereafter, the Mid-Continent note upon which Doran was primarily liable went into default. Mid-Continent subsequently obtained a state court judgment against Doran, PMC, and the two signatory officers of PMC for $50,815.50 plus interest and attorney's fees.

On October 16, 1972, Doran filed this suit in federal district court seeking damages for breach of contract, rescission of the contract based on violations of the Securities Acts of 1933 and 1934, and a judgment declaring the defendants liable for payment of the state judgment obtained by Mid-Continent.[3]

The court below found that the offer and sale of the "special participant" interest was a private offering because Doran was a sophisticated investor who did not need the

---

pants" and "special participants," respectively, in proportion to their capital contributions. The sole distinction between "participant" and "special participant" interests was that the former thus stood to gain a greater portion of tax deductions for intangible drilling and development expenses, which under § 263(c) of the Internal Revenue Code, 26 U.S.C. § 263(c) (1970), need not be capitalized but may be charged as current expenses.

3. The original complaint sought only contract damages. The amended complaint before us was filed one day later.

protection of the Securities Acts. The court also found that there was no evidence that PMC, its officers, or Kendrick made any misrepresentation or omissions of material facts to Doran. Finally, the court found that the overproduction of the wells was not a breach of the partnership agreement, but in any event there was no evidence that Doran suffered any losses as a result of the overproduction. The court concluded that all relief requested by Doran should be denied. Doran filed this appeal.

## II. The Private Offering Exemption

■ No registration statement was filed with any federal or state regulatory body in connection with the defendants' offering of securities.[4] Along with two other factors that we may take as established—that the defendants sold or offered to sell these securities, and that the defendants used interstate transportation or communication in connection with the sale or offer of sale—the plaintiff thus states a prima facie case for a violation of the federal securities laws. *See Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 686 (5th Cir. 1971).[5]

■ The defendants do not contest the existence of the elements of plaintiff's prima facie case but raise an affirmative defense that the relevant transactions came within the exemption from registration found in § 4(2), 15 U.S.C. § 77d(2). Specifically, they contend that the offering of securities was not a public offering. The defendants, who of course bear the burden of proving this affirmative defense, must therefore show that the offering was private. *See SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 690; *Lively v. Hirschfeld,* 440 F.2d 631, 632 (10th Cir. 1971); *United States v. Custer Channel Wing Corp.,* 376 F.2d 675, 678 (4th Cir.), *cert. denied,* 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967).

■ This court has in the past identified four factors relevant to whether an offering qualifies for the exemption. The consideration of these factors, along with the policies embodied in the 1933 Act, structure the inquiry. *Hill York Corp. v. American International Franchises, Inc., supra,* 448

---

**4.** The district court correctly concluded that the limited partnership interest was a "security" as that term is defined by the Securities Act of 1933 and the Securities and Exchange Act of 1934. *See Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093 (5th Cir. 1973); *see generally SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

**5.** Section 12(1) of the 1933 Securities Act, 15 U.S.C. § 77*l*(1), provides:

Any person who—
(1) offers or sells a security in violation of Section 77e of this title * * *.
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e, provide:
(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) To make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale * * *.
(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *.
Thus it is evident that § 5 establishes and defines proscribed conduct and that § 12(1) provides a remedy for a § 5 violation. The basic question then is whether or not Petroleum Management Corporation and the individual defendants violated § 5.

F.2d at 687–88; *Henderson v. Hayden, Stone Inc.,* 461 F.2d 1069, 1071 (5th Cir. 1972); *SEC v. Continental Tobacco Co. of South Carolina,* 463 F.2d 137, 158 (5th Cir. 1972); *see also Woolf v. S. D. Cohn & Co.,* 515 F.2d 591, 609 (5th Cir. 1975), *vacated on other grounds,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). The relevant factors include the number of offerees and their relationship to each other and the issuer, the number of units offered, the size of the offering, and the manner of the offering. Consideration of these factors need not exhaust the inquiry, nor is one factor's weighing heavily in favor of the private status of the offering sufficient to ensure the availability of the exemption. Rather, these factors serve as guideposts to the court in attempting to determine whether subjecting the offering to registration requirements would further the purposes of the 1933 Act.

 The term, "private offering," is not defined in the Securities Act of 1933. The scope of the § 4(2) private offering exemption must therefore be determined by reference to the legislative purposes of the Act. In *SEC v. Ralston Purina Co., supra,* the SEC had sought to enjoin a corporation's offer of unregistered stock to its employees, and the Court grappled with the corporation's defense that the offering came within the private placement exemption. The Court began by looking to the statutory purpose:

> Since exempt transactions are those as to which "there is no practical need for . . . [the bill's] application," the applicability of [§ 4(2)] should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."

346 U.S. at 124, 73 S.Ct. at 984. According to the Court, the purpose of the Act was "to protect investors by promoting full disclosure of information thought necessary to

informed investment decisions." *Id.* at 124, 73 S.Ct. at 984. It therefore followed that "the exemption question turns on the knowledge of the offerees." *Id.* at 126–27, 73 S.Ct. at 985. That formulation remains the touchstone of the inquiry into the scope of the private offering exemption. It is most nearly reflected in the first of the four factors: the number of offerees and their relationship to each other and to the issuer.

In the case at bar, the defendants may have demonstrated the presence of the latter three factors. A small number of units offered, relatively modest financial stakes, and an offering characterized by personal contact between the issuer and offerees free of public advertising or intermediaries such as investment bankers or securities exchanges—these aspects of the instant transaction aid the defendants' search for a § 4(2) exemption.[6]

Nevertheless, with respect to the first, most critical, and conceptually most problematic factor, the record does not permit us to agree that the defendants have proved that they are entitled to the limited sanctuary afforded by § 4(2). We must examine more closely the importance of demonstrating both the number of offerees and their relationship to the issuer in order to see why the defendants have not yet gained the § 4(2) exemption.

### A. *The Number of Offerees*

Establishing the number of persons involved in an offering is important both in order to ascertain the magnitude of the offering and in order to determine the characteristics and knowledge of the persons thus identified.

 The number of offerees, not the number of purchasers, is the relevant figure in considering the number of persons involved in an offering. *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 691. A private placement

---

**6.** Although Doran was initially contacted by a broker, he appears to have conducted much of the subsequent partnership business in which he was involved through direct dealings with PMC. There is evidence that PMC negotiated directly with the remaining offerees.

claimant's failure to adduce any evidence regarding the number of offerees will be fatal to the claim. *SEC v. Continental To-bacco Co., supra,* 463 F.2d at 161; *Henderson v. Hayden, Stone Inc., supra,* 461 F.2d at 1071–72; *Repass v. Rees,* 174 F.Supp. 898, 904 (D.Colo.1959). The number of offerees is not itself a decisive factor in determining the availability of the private offering exemption. Just as an offering to few may be public, so an offering to many may be private. *SEC v. Ralston Purina Co., supra,* 346 U.S. at 125, 73 S.Ct. at 984–85.[7] Nevertheless, "the more offerees, the more likelihood that the offering is public." *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 688. In the case at bar, the record indicates that eight investors were offered limited partnership shares in the drilling program—a total that would be entirely consistent with a finding that the offering was private.

The defendants attempt to limit the number of offerees even further, however. They argue that Doran was the sole offeree because all others contacted by PMC were offered "participant" rather than "special participant" interests. The district court, which did not issue a finding of fact or conclusion of law with respect to this argument, appears to have assumed that there were eight offerees.[8]

The argument is, in any event, unsupported by the record. The only evidence that the defendants adduced to show the number of offerees established merely that offers of "participant" interests were made to four investors who accepted, and that offers of "limited partnership" interests were made to three other prospective investors who declined. Because both "participant" and "special participant" interests were limited partnership interests, we are unable to discern from the record whether the three declining investors were offered "special participant" interests. Moreover, we have no evidence that the four "participants" were not also offered "special participant" interests. The defendants have the burden of proof regarding the number of offerees. We must therefore reject the argument that Doran was the sole offeree.[9]

---

**7.** *Compare United States ex rel. Shott v. Tehan,* 365 F.2d 191 (6th Cir. 1966) (offering to one person was public for purposes of criminal prosecution under Ohio Securities Act) *with Knapp v. Kinsey,* 249 F.2d 797 (6th Cir.), *cert. denied,* 356 U.S. 936, 78 S.Ct. 778, 2 L.Ed.2d 812 (1958) (triable issue of fact whether private offering when about 300 offerees involved). *Cf. Hirtenstein v. Tenney,* 252 F.Supp. 827 (S.D.N.Y.1966) (where plaintiff was sole purchaser of securities who may or may not have been sole offeree, there was triable issue of fact whether public offering).

**8.** The court below noted as a finding of fact that there were three declining "offerees" and four "participants" of the limited partnership. Although it thus appears to have assumed there were eight "offerees," the lower court also concluded as a matter of law that the offer of a special participant interest to Doran was private because Doran did not need the protections of the federal securities acts. Assuming the court did find that there were eight offerees, it thus ignored the interests of all but Doran in determining whether the single offering was private. On the other hand, it is possible that the court supposed that Doran was the sole offeree, although it offered no reasons for severing Doran's limited partnership interest from that offered to or purchased by the other investors, nor does the record support such a distinction.

**9.** Even had the defendants shown that Doran was the only investor to have been offered a "special participant" interest, however, it is doubtful that the defendants would thereby have established that Doran was the sole offeree with respect to the security in question. The two kinds of limited partnership interests were (1) offered as part of a single scheme of financing contemplated by the limited partnership agreement; (2) they appear to have been offered within a time span of a few months (3) for the same kind of consideration (4) and for the same general purpose. The only difference between the two kinds of limited partnership interests that appears on the record was that the "participants" were able to take a greater portion of intangible drilling deductions. Otherwise, according to the limited partnership agreement, the two kinds of limited partnership interests were identical. Accordingly, on the present state of the record we shall treat the eight offers of limited partnership shares in the Wyoming drilling venture as an integrated offering for purposes of determining the availability of the § 4(2) exemption. *See generally* Schwartz, *The Private Offering Exemption—Recent Developments,* 37 Ohio St.L.J. 1, 8–11 (1976).

In considering the number of offerees solely as indicative of the magnitude or scope of an offering, the difference between one and eight offerees is relatively unimportant. Rejecting the argument that Doran was the sole offeree is significant, however, because it means that in considering the need of the offerees for the protection that registration would have afforded we must look beyond Doran's interests to those of all his fellow offerees. Even the offeree-plaintiff's 20–20 vision with respect to the facts underlying the security would not save the exemption if any one of his fellow offerees was in a blind.

### B. The Offerees' Relationship to the Issuer

Since *SEC v. Ralston, supra,* courts have sought to determine the need of offerees for the protections afforded by registration by focusing on the relationship between offerees and issuer and more particularly on the information available to the offerees by virtue of that relationship. *Id.,* 346 U.S. at 126–27, 73 S.Ct. at 985. Once the offerees have been identified, it is possible to investigate their relationship to the issuer.

The district court concluded that the offer of a "special participant" interest to Doran was a private offering because Doran was a sophisticated investor who did not need the protections afforded by registration. It is important, in light of our rejection of the argument that Doran was the sole offeree, that the district court also found that all four "participants" and all three declining offerees were sophisticated investors with regard to oil ventures.

The need of the offerees for the protection afforded by registration is, to be sure, a question of fact dependent upon the circumstances of each case. *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 687. Nevertheless,

the trial court's conclusion with respect to the availability of the private offering exemption may be set aside if induced by an erroneous view of the law. *See SEC v. Continental Tobacco Co., supra,* 463 F.2d at 156–57; *Henderson v. Hayden, Stone Inc., supra,* 461 F.2d at 1071.

### 1. The role of investment sophistication

The lower court's finding that Doran was a sophisticated investor is amply supported by the record, as is the sophistication of the other offerees. Doran holds a petroleum engineering degree from Texas A&M University. His net worth is in excess of $1,000,000. His holdings of approximately twenty-six oil and gas properties are valued at $850,000.

Nevertheless, evidence of a high degree of business or legal sophistication on the part of all offerees does not suffice to bring the offering within the private placement exemption. We clearly established that proposition in *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 690. We reasoned that "if the plaintiffs did not possess the information requisite for a registration statement, they could not bring their sophisticated knowledge of business affairs to bear in deciding whether or not to invest . . . ." Sophistication is not a substitute for access to the information that registration would disclose. *United States v. Custer Channel Wing Corp., supra,* 376 F.2d at 678. As we said in *Hill York,* although the evidence of the offerees' expertise "is certainly favorable to the defendants, the level of sophistication will not carry the point. In this context, the relationship between the promoters and the purchasers and the 'access to the kind of information which registration would disclose' become highly relevant factors." 448 F.2d at 690.[10]

---

10. We do not intimate that evidence of the offerees' sophistication is required in all cases to establish a private offering exemption under § 4(2). Indeed, we have said that SEC Rule 146, 17 C.F.R. § 230.146 (1976), is "more restrictive than the cases in this Circuit in that it requires that the offeree either be sophisticated or advised by an offeree representative who is, in addition to the requirement that offerees receive or have access to information that registration would disclose." *Woolf v. S. D. Cohn & Co., supra,* 515 F.2d at 611–12 n. 14. In other words, in *Hill York* we said that the "sophistication" of the offerees was not a suffi-

In short, there must be sufficient basis of accurate information upon which the sophisticated investor may exercise his skills. Just as a scientist cannot be without his specimens, so the shrewdest investor's acuity will be blunted without specifications about the issuer. For an investor to be invested with exemptive status he must have the required data for judgment.

### 2. The requirement of available information

The interplay between two factors, the relationship between offerees and issuer and the offerees' access to information that registration would disclose, has been a matter of some conceptual and terminological difficulty. For purposes of this discussion, we shall adopt the following conventions: We shall refer to offerees who have not been furnished registration information directly, but who are in a position relative to the issuer to obtain the information registration would provide, as having "access" to such information. By a position of access we mean a relationship based on factors such as employment, family, or economic bargaining power that enables the offeree effectively to obtain such information. *See* SEC Rule 146(e), 17 C.F.R. § 280.146(e) (1976). When offerees, regardless of whether they occupy a position of access, have been furnished with the information a registration statement would provide, we shall say merely that such information has been disclosed. When the offerees have access to or there has been disclosure of the information registration would provide, we shall say that such information was available.

The requirement that all offerees have available the information registration would provide has been firmly established by this court as a necessary condition of gaining the private offering exemption. Our decisions have been predicated upon *Ralston Purina, supra,* where the Supreme Court held that in the absence of a showing that the "key employees" to whom a corporation offered its common stock had knowledge obviating the need for registration, the offering did not qualify for the private offering exemption. The Court said that an employee offering would come within the exemption if it were shown that the employees were "executive personnel who because of their position have access to the same kind of information that the act would make available in the form of a registration statement." *Id.,* 346 U.S. at 125–26, 73 S.Ct. at 985.

In *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 689, this court approved jury instructions that "correctly stated the ultimate test. . . . that every offeree had to have information equivalent to that which a registration statement would disclose." In subsequent cases we have adhered to that test. *See Woolf v. S. D. Cohn & Co., supra,* 515 F.2d at 613; *SEC v. Continental Tobacco Co., supra,* 463 F.2d at 158–61; *Henderson v. Hayden, Stone Inc., supra,* 461 F.2d at 1071.[11] Because the district court failed to apply this test to the case at bar, but

---

cient condition for the availability of the private offering exemption; Rule 146 says that "sophistication" is a necessary but not a sufficient condition.

11. In *Henderson v. Hayden, Stone Inc., supra,* the district court held that a transaction was not part of a public offering because "(1) the number of people involved in this capital venture was small, and all were sophisticated investors, (2) none of the defendants 'solicited for the sale of stock,' and (3) the amount of money invested by [plaintiff] was small vis-a-vis his total investment portfolio." We reversed because the defendants had failed to prove either the number of offerees or the offerees' relationship to the issuer. We said in part:

[T]he relationship between the offerees and the issue is not known. Did the offerees have any knowledge of the business affairs of [the issuer]? Did they possess the same information as would be found in a registration statement? Did they have access to such information?

461 F.2d at 1072. Although we were troubled by the fact that prior to his retirement plaintiff had been responsible for the investment portfolio of a loan company he owned and that this thoroughly sophisticated investor knew the stock was unregistered at the time of his purchase, we nevertheless permitted him to rescind.

rather inferred from evidence of Doran's sophistication that his purchase of a partnership share was incident to a private offering, we must remand so that the lower court may determine the extent of the information available to each offeree.

More specifically, we shall require on remand that the defendants demonstrate that all offerees, whatever their expertise, had available the information a registration statement would have afforded a prospective investor in a public offering. Such a showing is not independently sufficient to establish that the offering qualified for the private placement exemption, but it is necessary to gain the exemption and is to be weighed along with the sophistication and number of the offerees, the number of units offered, and the size and manner of the offering. *See SEC v. Continental Tobacco Co., supra,* 463 F.2d at 160; *see also Woolf v. S. D. Cohn & Co., supra,* 515 F.2d at 610–613. Because in this case these latter factors weigh heavily in favor of the private offering exemption, satisfaction of the necessary condition regarding the availability of relevant information to the offerees would compel the conclusion that this offering fell within the exemption.

■ The cornerstone of the regulatory structure envisaged by the authors of the Securities Act is disclosure. The Act is practical and pragmatic, not dogmatic and doctrinaire. It is designed to give a panoply of protection to the investor, but also to allow play in the marts of trade for offers of securities that do not require the oversight of the Securities and Exchange Commission. In suggesting the scope of that exemption, we cannot divine all the variables of a formula that might enable a trial court precisely to determine whether a given offering falls within or without its perimeter. There are few certitudes, and in interpreting the statute we must permit ourselves room for the ifs, the perhapses, and the maybes in commercial relationships and variegated investor postures. The question of exemption remains one of fact reserved in the first instance for the trial court. Nevertheless, it cannot be doubted

that within or without the perimeter of the private offering exemption, the policies of the Securities Act mandate that the courts focus on the information available to the offerees of a security.

### C. On Remand: The Issuer-Offeree Relationship

■ In determining on remand the extent of the information available to the offerees, the district court must keep in mind that the "availability" of information means either disclosure of or effective access to the relevant information. The relationship between issuer and offeree is most critical when the issuer relies on the latter route.

■ To begin with, if the defendants could prove that all offerees were actually furnished the information a registration statement would have provided, whether the offerees occupied a position of access pre-existing such disclosure would not be dispositive of the status of the offering. If disclosure were proved and if, as here, the remaining factors such as the manner of the offering and the investment sophistication of the offerees weigh heavily in favor of the private status of the offering, the absence of a privileged relationship between offeree and issuer would not preclude a finding that the offering was private. Any other conclusion would tear out of context this court's earlier discussions of the § 4(2) exemption and would conflict with the policies of the exemption.

Alternatively it might be shown that the offeree had access to the files and record of the company that contained the relevant information. Such access might be afforded merely by the position of the offeree or by the issuer's promise to open appropriate files and records to the offeree as well as to answer inquiries regarding material information. In either case, the relationship between offeree and issuer now becomes critical, for it must be shown that the offeree could realistically have been expected to take advantage of his access to ascertain

the relevant information.[12] Similarly the investment sophistication of the offeree assumes added importance, for it is important that he could have been expected to ask the right questions and seek out the relevant information.

In sum, both the relationship between issuer and offeree and the latter's investment sophistication are critical when the issuer or another relies on the offeree's "access" rather than the issuer's "disclosure" to come within the exemption. We shall first show that this formulation is consistent with the current state of private offering law in this and other circuits. Second, we shall examine the misconception that our cases require a privileged or "insider" relationship between issuer and offeree as a necessary condition of coming within the § 4(2) exemption. Once the distinction between "access" and "disclosure" is fully recognized, our caselaw should not be construed to embody such a requirement.

### 1. Disclosure or access: a disjunctive requirement

That our cases sometimes fail clearly to differentiate between "access" and "disclosure" as alternative means of coming within the private offering exemption is, perhaps, not surprising. Although the *Ralston Purina* decision focused on whether the offerees had "access" to the required information, 346 U.S. at 127, 73 S.Ct. at 981, the holding that "the exemption question turns on the knowledge of the offerees," *id.* at 126, 73 S.Ct. at 981, could be construed to include possession as well as access. Such an interpretation would require disclosure as a necessary condition of obtaining a private offering notwithstanding the offerees' access to the information that registration would have provided.

Both the Second and the Fourth Circuits, however, have interpreted *Ralston Purina* as embodying a disjunctive requirement. Thus, for example, in *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2nd Cir. 1959), *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1960), the court observed that *Ralston Purina* "held that the governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *See also SEC v. Tax Service, Inc.*, 357 F.2d 143, 144 (4th Cir. 1966).[13]

The cases in this circuit are not inconsistent with this view. In *Woolf v. S.D. Cohn & Co., supra*, 515 F.2d at 612–13, we admittedly read *Continental* as "requiring that there be disclosure of the information registration would have revealed to each offeree . . . ." Because the court in *Continental* found neither disclosure to all offerees of the information registration would provide nor their access to such information, however, the case does not hold that when sophisticated offerees have access to the requisite information by virtue of their privileged relationship to the issuer, actual disclosure is nonetheless necessary. Only if the defendants in *Continental* had demonstrated that all offerees were sophisticated and that all had access to the relevant information, but the court had nevertheless required actual disclosure, could *Continental* foreclose the view we express in the case at bar.

Similarly, in *Woolf* we found that because it was not clear "what information was disclosed to whom at what time," we were obliged to remand the case. Because the defendants in *Woolf* did not argue that

---

**12.** For example, the offeree's ability to compel the issuer to make good his promise may depend on the offeree's bargaining power or on his family or employment relationship to the issuer.

**13.** In *Tax Service*, after repeating the Supreme Court's statement in *Ralston Purina* that "the exemption question turns on the knowledge of the offerees," the Fourth Circuit wrote:

Thus where the class of offerees has neither knowledge of nor "access to the kind of information which registration would disclose," the offerees are in need of the protection of the Act and the full disclosure derived from compliance with section 5.

357 F.2d at 144.

the offerees' access to information qualified the offering for private status even without actual disclosure, we did not and could not hold that disclosure was the only means of coming within the exemption.

*Woolf* refers to Rule 146 as a "useful frame of reference to an appellate court in assessing the validity of § 4(2) exemptions claimed . . . prior to its effective date." 515 F.2d at 612. Since *Woolf* elsewhere notes specifically that Rule 146 would permit the issuer to show either access or disclosure,[14] it is inconceivable that the court in *Woolf* would establish more stringent requirements for this circuit or would interpret *Continental* to establish such requirements.[15] Rather, *Woolf* observes correctly that Rule 146 does not purport to be an exclusive definition of the circumstances under which the exemption is available, implying that there will be a class of placements that do not satisfy the more stringent criteria of the Rule 146 safe harbor but are nevertheless to be accorded private status. *Id.* at 612.[16]

▆▆▆ Although Rule 146 cannot directly control the case at bar, we think its disjunctive requirement that the private offering claimant may show either "access" or "disclosure" expresses a sound view that this court has in fact implicitly accepted. For example, in *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 690–91, this court thought it necessary to show that the offerees neither possessed the information registration would afford nor had access to such information. *See also* 1 Loss, Securities Regulation 657 n.53 (2d ed. 1961), *quoted in Hill York, supra,* 448 F.2d at 698. And in *Henderson v. Hayden, Stone Inc., supra,* 461 F.2d at 1072, the court clearly separates the questions: "Did [the offerees] possess the same information as would be found in a registration statement? Did they have access to such information?"[17]

### 2. The role of insider status

▆▆▆ Once the alternative means of coming within the private placement exemption are clearly separated, we can appreciate the proper role to be accorded the requirement that the offerees occupy a privileged or "insider" status relative to the issuer. That is to say, when the issuer relies on "access" absent actual disclosure, he must show that the offerees occupied a privileged position relative to the issuer that afforded them an opportunity for effective access to the information registration would otherwise provide.[18] When the

14. 515 F.2d at 611 n.14.

15. Rule 146(e), 17 C.F.R. § 230.146(e) (1976) provides in part:
 (1) Either
 (i) Each offeree shall have access during the course of the transaction and prior to the sale to the same kind of information that is specified in Schedule A of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense; or
 (ii) Each offeree or his offeree representative(s), or both, shall have been furnished during the course of the transaction and prior to sale, by the issuer or any person acting on its behalf, the same kind of information that is specified in Schedule A of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense.

16. The limits of the class of non-Rule 146 private placements remain to be delineated, however, and nothing in *Woolf* or in this opinion is to be taken as establishing the criteria for private offerings that would fail to meet the standards of Rule 146 when that rule is applicable.

17. One argument for requiring actual disclosure as opposed to access is that the existence of a written disclosure statement makes it easier subsequently to evaluate the accuracy of the information imparted. Because any misleading information will be recorded, the issuer may have a greater incentive to be careful. Despite the force of this argument when ordinary investors are concerned, with respect to sophisticated investors the additional protection may be unnecessary. Sophisticated investors will be more able to discern a fraud or misrepresentation and will presumably have the acumen successfully to invoke the securities laws even if evidence of the misrepresentation is not as easily preserved.

18. That all offerees are in certain respects "insiders" does not ensure that the issuer will gain the private placement exemption. An insider may be an insider with respect to fiscal matters of the company, but an outsider with respect to

issuer relies on actual disclosure to come within the exemption, he need not demonstrate that the offerees held such a privileged position. Although mere disclosure is not a sufficient condition for establishing the availability of the private offering exemption, and a court will weigh other factors such as the manner of the offering and the investment sophistication of the offerees, the "insider" status of the offerees is not a necessary condition of obtaining the exemption.

Because the line between access and disclosure has sometimes been obscured, some have interpreted this court's decision in *Continental* as limiting the § 4(2) exemption to insider transactions.[19] As we pointed out in our recent decision in *Woolf,* however, such fears are unfounded. 515 F.2d at 610.

The language from *Continental* that gave rise to those fears consists in the court's findings that "Continental did not affirmatively prove that all offerees of its securities had received both written and oral information concerning Continental, that all offerees of its securities had access to any additional information which they might have required or requested, and that all offerees of its securities had personal contacts with the officers of Continental." 463 F.2d at 160. It is possible to read this as a list of the necessary conditions for coming within the § 4(2) exemption, and therefore to infer that a private placement claimant must show the "insider" status of the offerees. Properly viewed in context, however, these statements were not clearly intended to establish necessary conditions, but only to point to the manifold weaknesses of the

defendant's claim which, taken together, precluded private offering status.

In *Continental,* the court admittedly agreed with the SEC's position that even if the prospectus that Continental had sent to purchasers contained all the information registration would disclose, that fact alone would not justify the exemption. 463 F.2d at 160. That is doubtless true, since even if all the purchasers of Continental's securities had received full disclosure, the defendant would not have established that all offerees had received full disclosure. Because Continental had failed to sustain its burden of demonstrating the number of offerees, moreover, even the fact that all known offerees might have received disclosure would still have been insufficient to ensure the availability of the exemption. But the court's language in *Continental* should not be read as requiring in addition to full disclosure to all offerees a demonstration of the offerees' insider status.

Rather, the court's language regarding Continental's failure to show that all offerees had access to the requisite information and that all offerees had personal contacts with Continental's officers may be read as foreclosing the possible alternative route to the § 4(2) exemption. Because the prospectus did not contain all the information registration would provide and because it was not established that all offerees received the prospectus, it was clear that Continental could not rely upon actual disclosure. The additional language in *Continental,* though admittedly subject to other interpretations, may be read as making clear that there was in that case no privileged

a particular issue of securities. He may know much about the financial structure of the company but his position may nonetheless not allow him access to a few vital facts pertaining to the transaction at issue. If Doran had effective access to all information that registration would provide, he would be a transactional insider. That is all we require regarding the availability of information. If, on the other hand, his inside knowledge was incomplete or his access ineffective, he would be a transactional outsider despite the fact that we might consider him an "insider" for other purposes.

**19.** For example, one commentator has written that "if Continental Tobacco represents the current state of the law regarding private placement exemption in non-Rule 146 transactions (highly doubtful), its availability is limited to insider transaction." 2 S. Goldberg, Private Placements and Restricted Securities § 2.16[e] (1975). *See also* Schwartz, *The Private Offering Exemption—Recent Developments*, 37 Ohio St.L.J. 1, 19 (1976), and cases cited therein; Rediker, *The Fifth Circuit Cracks Down on Not-So Private Offerings*, 25 Ala.L.Rev. 289, 311–17 (1973).

relationship between the offerees and the issuer that might have compensated for the defendant's palpable failure to disclose.

Although the disjunctive nature of the requirement is, to be sure, not made explicit in *Continental,* it is important that the pertinent conclusion of fact held clearly erroneous in that case was that "the offerees . . . were furnished and/or provided access to the same type of information that would have been provided in a registration statement . . . ." 463 F.2d at 159. In order to hold this conclusion clearly erroneous, it was thus necessary to show that the defendant had failed to prove either disclosure or access.

█ In any event, absent a clear and unambiguous indication to the contrary, we do not read *Continental* as requiring insider status. We think that any such requirement would inhibit the ability of business to raise capital without the expense and delay of registration under circumstances in which the offerees did not need the protection of registration. The enactment of Rule 146 represents the SEC's recognition of this legitimate business need. We think that it would be unwise to adopt in this circuit a requirement of insider status notwithstanding disclosure or that of actual disclosure notwithstanding effective access. Such requirements would constrict the scope of the private offering exemption more narrowly than does Rule 146 and would retard necessary capital investment without a corresponding benefit to those investors who need the protection of registration.

Rule 146 offers some rays of sunlight into the limbos and uncertain depths of § 4(2). The cases cast at best a faint beacon toward the horizon of decision. While we appreciate full well that the test we have fashioned remains too fluid to enable the would-be private offering issuer to feel entirely secure, we are confident that, at long last, the safe harbor of Rule 146 will provide that security and that few private placement claimants will stray far from that harbor. Rule 146 is a serotine development. More than two decades passed after *Ralston*

before the SEC sufficiently elaborated on the definitional concepts behind § 4(2). With respect to those transactions that antedate the effective date of Rule 146, this case and those preceding it in this circuit establish as the critical factor in determining whether the exemption applies to a particular offering the availability of information to all offerees. The privileged status of the offerees must be demonstrated only when it is necessary to the claimant's efforts to establish that the requisite information was in fact available.

### III. Breach of Contract

We affirm that portion of the district court's judgment rejecting Doran's claim that he was damaged by the defendants' overproduction of the wells in breach of the partnership agreement.

█ The district court found in part that the overproduction of the wells did not constitute a breach of the partnership agreement. The district court's finding is not supported by the record. The partnership agreement provided, *inter · alia:*

> 8.3 Operator shall operate, or cause to be operated each completed well of the partnership in accordance with accepted oil field practices and in conformity with any valid conservation or curtailment program which may be imposed by law or government agency.

It is conceded that the wells were deliberately overproduced in violation of the production allowances of the Wyoming Oil and Gas Conservation Commission. The conclusion is inescapable that such overproduction violated ¶ 8.3 of the partnership agreement.

Nevertheless, as the district court correctly concluded, the plaintiff was in no way damaged by the breach. The court below found that despite the cessation of production from November 16, 1971 until August 9, 1972, the overproduction of the wells prior to that time resulted in a greater yield than would have accrued had the wells been operated continuously through August 9, 1972, within the allowable limits designated by the Commission. Hence Do-

ran was not injured by the overproduction, but rather realized a net benefit. Not only was the overall production of oil before August 9, 1972 greater than it would have without the breach, but the production payments accrued to Doran sooner than they would have had the wells been continuously produced at allowable levels.

IV. Conclusion

An examination of the record and the district court's opinion in this case leaves unanswered the central question in all cases that turn on the availability of the § 4(2) exemption. Did the offerees know or have a realistic opportunity to learn facts essential to an investment judgment? We remand so that the trial court can answer that question.

This opinion focuses on facts because the Securities Act focuses on facts—facts disclosed, facts known, or access to facts. "Insider" or "outsider" labels are not determinative. Traditional forms are not determinative. In adjusting the generalities of § 4(2) to the realities of the contemporary market, we have seized on the availability to all offerees of pertinent facts. We have conditioned the private offering exemption on either actual disclosure of the information registration would provide or the offerees' effective access to such information. If the issuer has not disclosed but instead relies on the offerees' access, the privileged status of the offerees relative to the issuer must be shown.

▇ We are conscious of the difficulty of formulating black letter law in this area in light of the multiplicity of security transactions and their multifarious natures. Securities regulation is often a matter of the hound chasing the hare as issuers devise new ways to issue their securities and the definition of a security itself expands. We do not want the private offering exemption to swallow the Securities Act, and we must resolve doubtful cases against the private placement claimant and in favor of the Act's paramount value of disclosure. By the same token, we must heed the existence and purposes of the exemption, and be cautious lest we discourage private avenues for raising capital. Our present emphasis on the availability of information as the *sine qua non* of the private offering is an attempt to steer a middle course.

We must reverse in part the judgment of the district court and remand for proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.