**Robert MITCHELSON, Plaintiff**
v.
**AVIATION SIMULATION**
**TECHNOLOGY INC. and**
**THE SIPPICAN CORPORATION**
**Defendants**

No. 80-2654-S

United States District Court
Commonwealth of Massachusetts

**February 19, 1982**

**Ernest B. Murphy,** counsel for plaintiff
**Michael A. Collora, esq.,** counsel for plaintiff
**Howard S. Rosenblum,** counsel for defendant

## MEMORANDUM AND ORDER
SKINNER, D.J.

Plaintiff brings this suit seeking injunctive and monetary relief for damages allegedly sustained during the acquisition of defendant Aviation Simulation Technology ("AST") by defendant The Sippican Corporation ("TSC"). In Count I plaintiff alleges breach of an employment contract, in Count II he alleges violations of M.G.L. c. 93A, sec. 2, and in Counts III and IV he alleges failure to comply with the registration provisions of the Securities Act of 1933, 15 U.S.C. sec. 77e, and the Massachusetts Securities Law, M.G.L. c. 110A, sec. 301, respectively. Jurisdiction is based on diversity of citizenship and the existence of a federal question. Defendants have now moved to dismiss or for summary judgment on Counts II, III, and IV. For the reasons which follow, defendants' motion is allowed as to Count IV and denied as to Counts II and III.

In 1977, plaintiff, a commercial pilot, and Joshua Horwitz, an engineer, formed AST. The company was to produce and sell a computer-aided flight simulator for training use in the general aviation industry. Plaintiff was vice-president, responsible for marketing the simulator and Horwitz was president, responsible for its development. While AST soon received many orders for its simulator, it experienced difficulties in actually producing the units for sale.

By early 1979, AST was in need of outside financial assistance. After reviewing several financing offers, plaintiff and Horwitz accepted the plan presented by TSC. Under the agreement signed March 2, 1979 ("March Agreement"), TSC purchased $355,000 of AST notes, agreed to provide an additional $300,000 in financing over the next few years, bought 15,000 shares of newly issued stock, and acquired the right to place three directors on AST's five-member board, as well as the right to purchase all of AST's outstanding shares during a six-month "window" in 1982.

The financial assistance provided in the March Agreement did not eliminate AST's problems. The company continued to experience production delays. Plaintiff's relationship with Horwitz deteriorated to the point where they stopped speaking to each other. TSC was asked to and did provide an additional $350,000 in financing between March and October, 1979.

Faced with AST's continuing difficulties, TSC decided to accelerate its acquisition timetable. In early October, 1979, TSC's president wrote to plaintiff and Horwitz suggesting that the March Agreement be amended to include additional cash commitments by TSC and a stock-for-stock exchange of all outstanding AST shares for 50,000 shares of TSC, with additional TSC shares to be earned if AST became profitable. Plaintiff and Horwitz agreed to the plan

on October 24, and the new agreement was signed on November 29, 1979 ("Amended Agreement").

In addition to the Amended Agreement, plaintiff also signed an employment agreement with TSC on November 29 ("Employment Agreement"). TSC agreed to hire him in a senior sales capacity through December, 1981. The Employment Agreement contained nondisclosure and noncompetition clauses. Appendix I allowed plaintiff the option of terminating his employment and receiving simulators in exchange for any TSC stock he had received or was due under the Amended Agreement.

TSC exercised its option to purchase AST on December 12, 1979. On December 19, 1979, 5,608 unregistered shares of TSC were transferred to the AST shareholders[1] in exchange for their stock.

Plaintiff terminated his employment with TSC on December 17, 1979. Under Appendix I of the Employment Agreement, he elected to exchange his TSC stock for several flight simulators. TSC agreed to provide the first two simulators on April 14, 1980. When plaintiff arrived to take delivery of the simulators, he alleges that he was forced to sign a new agreement substantially modifying the terms of Appendix I and prohibiting him from selling, assigning, deeding, or leasing any of the simulators without AST's approval. On May 2, 1980, plaintiff took receipt of two more simulators. According to his agreement with TSC, he was to continue to receive new simulators at a rate of two per month through December, 1980.

In May, 1980, plaintiff opened a new business. Named "Simulation Associates", it was to operate a "recurrent training center" and flight training programs. The four AST simulators already received by plaintiff were placed at several flight training schools in Florida and were operated by his company.

In June, 1980, TSC and AST notified plaintiff that they considered his actions to be in breach of his nondisclosure and noncompetition agreements. Accordingly, they refused to deliver the additional simulators provided for in Appendix I and refused to service the four units already delivered.

Plaintiff then instituted this suit challenging defendants' action on several grounds. Count I alleges that defendants have breached Appendix I of the Employment Agreement by refusing to provide him with the additional simulators (or his severance pay) and Paragraph 4 of the Amended Agreement by failing to provide the additional TSC shares he has earned by AST's success. Count II alleges that defendants have violated M.G.L. c. 93A, sec. 2 by engaging in unfair methods of competition and unfair and deceptive practices throughout TSC's dealings with plaintiff. And, Counts III and IV allege that TSC's failure to register the stock it exchanged for the AST shares violates the Securities Act of 1933, 15 U.S.C. sec. 771(1), and the Massachusetts Securities Law, M.G.L. c. 110A, sec. 410(a).

**Count III.**

Defendants have moved for summary judgment on Count III. While they concede that plaintiff has alleged a prima facie violation of sec. 5(a), 15 U.S.C. sec. 77e(a), and sec. 12(1), 15 U.S.C. sec. 771(1), see, **Doran v. Petroleum Management Corp.,** 545 F.2d 893, 899 (5th Cir. 1977), they contend that the transaction was exempt from the registration requirements of sec. 5(a). Their position is that the exchange of TSC stock for AST stock was a "private offering" under sec. 4(2), 15 U.S.C. sec. 77d(2), and therefore sec. 5(a) does not apply. See, **SEC v. Ralston Purina Co.,** 346 U.S. 119 (1953).

---

1. Plaintiff held approximately 40% of the AST shares and received 2,209 shares of TSC. Horwitz held another 40% and the remaining 20% (along with some options and a warrant) was held by 12 other individuals.

In order to qualify as a private placement under sec. 4(2), defendants have the burden of proving that several factors are present. **SEC v. Murphy,** 626 F.2d 633, 641 (9th Cir. 1980). These factors have been formulated in various ways by different courts, but generally include a showing that:

> the purchasers (1) are limited in number, (2) are sophisticated, and (3) have a relationship with the issuer enabling them to command access to information that would otherwise be contained in a registration statement.

**Cook v. Avien, Inc.,** 573 F.2d 685, 691 (1st Cir. 1978), see also, **SEC v. Murphy,** 626 F.2d at 644.[2] These factors are to be considered in a flexible manner and sec. 4(2) is to be "construed narrowly in order to further the purpose of the Act: 'To provide full and fair disclosure of the character of the securities . . .'" **Id.** at 641. As a result, qualification for an exemption under sec. 4(2) is generally "a question of fact dependent upon the circumstances of each case". **Doran v. Petroleum Management Corp.,** 545 F.2d at 902.

Plaintiff argues that summary judgment is not appropriate on Count III because there are "genuine issues as to (a) material fact". **Bromley-Heath Modernization Committee v. Boston Housing Authority,** 459 F.2d 1067, 1071 (1st Cir. 1972). He does not dispute defendants' position that several factors which may indicate the applicability of sec. 4(2) have been established, including: his qualifications as an offeree, the limited manner of the offering, the small number of offerees, and the investment intent of the purchasers. See, Schneider, **The Statutory Law of Private Placements,** 14 The Rev. of Sec. Reg. 869, 872 (1981). He maintains, however, that there exists a question of fact as to the nature, extent, and timing of the information he received from TSC. His position is that TSC failed to provide him with adequate information about its financial difficulties and that therefore sec. 4(2) does not apply.

Defendants maintain that he was provided with all the necessary information.

The nature, extent, and timing of the information available to an offeree is the "touchstone of the inquiry into the private offering exemption". **Doran v. Petroleum Management Corp.,** 545 F.2d at 900. The existence of a genuine factual dispute on that issue would clearly render summary judgment inappropriate. See, **Morrissey v. Procter and Gamble,** 379 F.2d 675, 677 n.2 (1st Cir. 1967).

In order to qualify the offering under sec. 4(2), the issuer has to make available to the offerees "the same kind of information that the Act would make available in the form of a registration statement". **SEC v. Ralston Purina Co.,** 346 U.S. at 125-126. Courts have not required that the issuer provide information on all 32 categories of Schedule A, 15 U.S.C. sec. 77aa, but the offeree must have available "the sort of information about the issuer that registration reveals". **SEC v. Murphy,** 626 F.2d at 647. In some cases, that can be accomplished by making the issuer's most recent annual report or Form 10 filings available to the offeree. See, Rule 146(e)(1)(a)(1), 17 C.F.R. 203.146 (e)(1)(a)(1). Simply making such reports available may not be sufficient, however, where there are "any material changes in the issuer's affairs which are not disclosed in the documents furnished". **Id.** at 203.146(e)(1)(a)(2).

---

2. The SEC has codified these factors in a nonexclusive safe harbor for private offerings. SEC Rule 146, 17 CFR 203.146. Defendants have failed to comply with all the procedural requirements of the Rule so it does not control this case, but its substantive provisions can be used to help determine the applicability of § 4(2). See, **Doran v. Petroleum Management Corp.,** 545 F.2d at 902.

There are two ways in which the necessary information can be made available. It can be provided directly to the offeree by the issuer ("disclosure"), or the offeree can be in such a position with respect to the issuer that he can be said to have effective access to the information ("access"). **Doran v. Petroleum Management Corp.**, 545 F.2d at 904. In this case, plaintiff has not been shown to have had "access" to TSC's financial information. While plaintiff had numerous contacts with TSC personnel, he did not have the internal position or economic bargaining power necessary to insure his access to TSC's records. **Id.** at 903, Rule 146(e) note, 17 C.F.R. 203.146(e). Thus, the only way that plaintiff could be said to have received the necessary information is if TSC disclosed it to him.[3]

Disclosure can be made either directly to the offeree or to the offeree's representative. See, Rule 146(e)(ii), **Kalpmeier v. Telecheck International, Inc.**, 482 F.2d 247, 254 (8th Cir. 1973). An issue of fact exists as to whether plaintiff ever directly received the information from TSC. He maintains that the only financial information he received was provided at the signing of the March Agreement and consisted of TSC's 1978 annual report (showing large profits) plus oral assurances from TSC's president that the company was enjoying continued financial success, even its Amtron subsidiary. He denies having received TSC's 1978 Form 10-K or its Form 10-Q for the third quarter of 1979. Defendants contend that he was provided with all of that information.

There is also an issue of fact as to the adequacy of the information provided to plaintiff's representative. Plaintiff has admitted that during the negotiations with TSC he was represented by Lawrence M. Levy, corporate counsel for AST. Levy has stated that he received TSC's 1978 Form 10-K and its Form 10-Q for the third quarter of 1979 at the closing of the Amended Agreement on December 19, 1979. If that information adequately represented the financial condition of TSC at the time of the closing, it would be a sufficient basis on which to find that TSC had met its disclosure requirement.

Plaintiff, however, contends that the Form 10 filings did not fully and adequately disclose TSC's financial difficulties during 1979. As opposed to the successful year TSC enjoyed in 1978, it registered a net loss in 1979, mostly due to problems in its Amtron subsidiary. Plaintiff maintains that the first time he became aware of the fact that TSC was losing money in 1979 was when he saw a TSC press release dated December 28, 1979, nine days after TSC had completed its acquisition of AST. He contends that TSC knew of the large fourth quarter losses before the closing of the Amended Agreement,[4] that while the third quarter Form 10-Q indicated that Amtron was experiencing financial difficulties it did not adequately disclose the extent of the problems, and that TSC should have made more extensive disclosure of its financial downturn before the closing. Defendants maintain that Levy received all of the public information about TSC that was available, as soon as it was available, and that that information was sufficient to qualify the exchange as a private offering.

In view of this dispute over the adequacy of the information disclosed to plaintiff and his representative on the state of TSC's finances during 1979, summary judgment is inappropriate. Accordingly, defendants' motion for summary judgment on Count II is DENIED.

---

3. The fact that plaintiff may have been a "sophisticated" investor does not obviate the need to make information about the issuer available to him. See, **Lawler v. Gilliam**, 569 F.2d 1283, 1289-1290 (4th Cir. 1978).

4. For example, plaintiff has submitted the minutes of a meeting of TSC personnel held on December 10, 1979, nine days before the closing, in which the extent of the losses for 1979 was discussed.

### Count IV.

Defendants have also moved for summary judgment on Count IV. They contend that registration of the TSC shares was not required under the Massachusetts Securities Law, M.G.L. c. 110A, sec. 301, because the exchange for AST stock was an exempt private offering under state law. Id. sec. 402(b)(9).

I agree. Section 402(b)(9) provides that the following transaction is exempt from section 301:

> any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons . . . in the commonwealth . . ., if (A) the seller reasonably believes that all the buyers in the commonwealth . . . are purchasing for investment . . .

M.G.L. c. 110A, sec. 402(b)(9). In this case, the offer was directed to 14 persons and TSC reasonably believed that all the buyers were purchasing solely for investment (witness the purchasers' statement to that effect in the Amended Agreement and the legend placed upon the TSC shares received).

Plaintiff argues that sec. 402(b)(9) is not available to defendants because they did not file a notice of the transaction with the Secretary of State under sec. 402(b)(9)(B). That notice is only required, however, where "an offer involves the payment directly or indirectly of any commission or other remuneration for soliciting any prospective buyer in the commonwealth". sec. 402(b)(9)(B). Plaintiff has not alleged, nor does the record suggest that such a commission or other remuneration was paid in this case. Therefore, defendants were not required to file a notice with the Secretary of State in order to qualify for the exemption.

Accordingly, defendant's motion for summary judgment on Count IV is ALLOWED.

### Count II.

Defendants have moved to dismiss Count II for failure to state a claim. They contend that M.G.L. c. 93A does not apply in this case because: (1) it does not provide a remedy for the action complained of, and (2) they are exempt from its provisions.

Defendants first contend that in Count II plaintiff merely alleges a breach of contract for their failure to deliver more simulators or to pay his severance pay. They maintain that c. 93A does not provide any remedies for mere breaches of contract, citing **Whitinsville Plaza, Inc. v. Kotseas,** Mass. Adv. Sh. (1979) 1252, 1282, 390 N.E.2d 243, 251 (1979), and other cases.

In his amended complaint, however, plaintiff has alleged more than a mere breach of contract. He has stated five unfair or deceptive practices that defendants allegedly engaged in: (1) forced modification of an existing contract; (2) imposition of an unfair noncompetition clause; (3) imposition of unfair restrictions on alienation; (4) failure to disclose material facts about TSC's financial condition; and (5) failure to perform their obligations under Appendix I of the Employment Agreement. Without passing on the merits of any of the challenged practices, the allegations are sufficient to state a claim of "(u)nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" under M.G.L. c. 93A, sec. 2(a).

Defendants' second argument is that they are exempt from the provisions of c. 93A because they derive at least 20% of their revenue from interstate commerce and the transactions did not "occur primarily and substantially within the commonwealth". M.G.L. c. 93A, sec 3(1)(b).

Plaintiff does not contest that defendants derive well over 20% of their revenues from interstate commerce. He does contend that c. 93A still governs the case because the transactions occurred primarily in Massachusetts.

I agree. While plaintiff was living in Florida when he received defendants' notice that they were not going to deliver any more simulators, that is only one part

of his claim under c. 93A. The alleged forced modification of the contract took place in Massachusetts, the agreements containing the allegedly unfair noncompetition and restricted alienation clauses were negotiated and signed in Massachusetts, and the alleged failure to disclose material facts took place during negotiations in Massachusetts. These contacts are sufficient to bring this action under the exception to the exemption in sec. 3(1)(b)(i).[5]

Accordingly, defendants' motion to dismiss Count II is DENIED.

**Walter Jay Skinner**
**United States District Judge**

---

5. While the need for a private party to file notice with the FTC under M.G.L.c. 93A, § 3(1)(b)(ii), where the attorney general is not a party to the case, has apparently not been decided, see, **Dodd v. Commercial Union Insurance Co.**, 373 Mass. 72, 365 N.E.2d 802, 808 (1977), I do not think that the statute requires such a filing.