**Joseph J. LAWLER, Trustee in
Bankruptcy for Frank E.
Mower, II, Appellant,**

v.

**Thomas W. GILLIAM, Jr. and General
Erle Cocke, Jr., Appellees.**

No. 76–1951.

United States Court of Appeals,
Fourth Circuit.

Argued March 16, 1977.

Decided Jan. 9, 1978.

Benjamin C. Ackerly, Richmond, Va. (Charles H. Cuthbert, Jr., Hunton & Williams, Richmond, Va., on brief), for appellant.

Benjamin W. Dulany, Washington, D. C. (Jackson, Campbell & Parkinson, Washington, D. C., on brief), for appellees.

Before BUTZNER, RUSSELL and HALL, Circuit Judges.

BUTZNER, Circuit Judge:

Joseph J. Lawler, trustee in bankruptcy for Frank E. Mower, II, appeals the judgment of the district court dismissing his claims against Erle Cocke, Jr., and Thomas W. Gilliam, Jr., based on § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1), and for liability on their endorsement of two notes under Virginia law. Because we conclude that Lawler should prevail on his § 12(1) claim, we need not decide whether Cocke and Gilliam are also liable on their endorsements of the notes.

■ In Count I of the amended complaint, Lawler, as trustee for Mower, claims damages under § 12(1) of the Act.[1] That section creates virtually absolute liability for offering or selling a security in violation of § 5 of the Act, 15 U.S.C. § 77e. In order to recover on his § 12(1) claim, Lawler must show that Cocke and Gilliam violated § 5 by utilizing some instrument of interstate commerce to offer or sell to Mower a security for which no registration statement was in effect. *See Lewis v. Walston & Co.*, 487

---

1. Lawler bases other counts of the complaint on § 12(2), 15 U.S.C. § 77*l*(2) and § 17(a), 15 U.S.C. § 77q(a) of the 1933 Act; § 10(b) 15 U.S.C. § 78j(b) of the 1934 Act; Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; §§ 13.1–502 and 13.1–522 of the Code of Virginia; and common law fraud. These claims, which were dismissed by the district court, are not presented on appeal.

F.2d 617, 621 (5th Cir. 1973); III Loss, Securities Regulation 1692–98 (2d ed. 1961).

Cocke and Gilliam deny that they were offerers or sellers of securities to Mower. They allege as an affirmative defense that their transactions with Mower were exempt under § 4(2) of the Act, 15 U.S.C. § 77d(2), which specifies that the registration requirement does not apply to "transactions by an issuer not involving any public offering." In addition, Cocke and Gilliam assert that the doctrines of in pari delicto and unclean hands bar recovery by Lawler. They do not dispute the interstate nature of the transactions.

## I

The trustee's claims arise from a fraudulent scheme operated by Robert D. Johnson, generally under the name of Ridge Associates. Johnson offered investors Ridge notes with rates of return varying from 30% to 100%. He purported to use the money to import industrial wines which he sold at substantial profits. In fact, the business was a hoax; he merely used the money from some investors to pay off others. In his bankruptcy proceedings, more than 100 investors filed claims aggregating $21,000,000. Although Johnson's fraud depended on continually increasing the number of participants, he avoided contacts with most of them. Cocke and Gilliam were among the few people who conferred directly with him. It is uncontested that only Johnson knew that the scheme was fraudulent.

Cocke, a management consultant, initially invested in Johnson's wine scheme through an intermediary. He studied the industrial wine trade in general, but when he attempted to investigate the particulars of Johnson's business, Johnson would always stop him. He testified that Johnson warned him, "if you probe this too much, you probably will break up our relationships and connections for going forward." Gilliam, a business consultant and former securities analyst, relied on Cocke's investigation. Despite their lack of information about the details of Johnson's business, both

men, enthused by fabulous profits, invested large amounts of their own money and solicited funds from other people. Inevitably, they eventually suffered substantial net losses.

After he started investing with Johnson, Cocke advised him about other investments and worked closely with him on a number of business ventures. Johnson subsequently asked Cocke to operate directly with him in the wine business and to help raise money for it. As Cocke described the conversation, he told Johnson:

> I then came back and said, "Well, look. I have been a limited partner. You are talking about making me a general partner under you," and that type of thing, and he said, "Yes."

> I said, "Well, inasmuch as Tom Gilliam had introduced me to you, . . . I felt an obligation to him. Tom is now located in my office and therefore it looked like a very logical way to begin to put it all together."

Cocke and Gilliam organized three limited partnerships for investment in Johnson's business. They offered these partnerships to people who could make a $50,000 minimum payment, ultimately raising about $1,000,000. They also began organizing another operation for smaller investments which, however, was aborted by the S.E.C.'s exposure of Johnson.

Mower began investing through his attorney in Johnson's business. In addition to his own funds, he obtained money from other people. Mower assured these investors of profitable returns, gave them his personal guarantee, and received commissions of approximately 10%. Although he had profited through this operation, he was dissatisfied with the terms offered by his attorney. Therefore, Mower contacted Gilliam, a previous acquaintance, and asked him for an introduction to Johnson, hoping to obtain a higher return by investing directly with Johnson.

Even though Mower offered to pay for the introduction, Gilliam replied that he could not introduce him to Johnson. Gil-

liam added, however, that he "could probably represent . . . [Mower] and put some money with . . . Johnson on behalf of Mower. . . ." According to Gilliam, he and Mower discussed the tax treatment of the wine investments and the limited partnerships established by Gilliam and Cocke in "at least a half-dozen telephone calls" over a two-month period. In those conversations Gilliam told Mower that investments in the limited partnerships would yield a net return in the "mid-30 per cents, if everything paid off as expected, and we took a fee out."

Mower, however, was not interested in a limited partnership because he wanted the maximum rate of return. After Johnson told Gilliam that future returns could be a minimum of 52%, Gilliam assured Mower that he and Cocke could get him a return of at least 45%. They therefore created Cogil Partners, an *ad hoc* entity through which they could channel Mower's money to Johnson and provide Mower with Ridge notes, which he needed to use as collateral for bank loans. Although Mower knew that Cocke and Gilliam would take a commission on a return higher than 45%, he did not know the rate of return they expected to get from Johnson.

Using his own funds as well as money from other investors, Mower initially paid Cocke $170,000. Cocke delivered this money to Johnson in return for a Ridge note payable to Cocke for that amount bearing Johnson's personal guarantee. Johnson also contracted with Cocke for a return not less than $110,500. Cocke endorsed the note to Cogil Partners, which endorsed it to Mower. Cocke also advised Mower that the return would not be less than $76,500. He did not assign to Mower the contract for the $110,500 profit.

Gilliam later called Mower to advise him of another opportunity to invest. Mower then paid Cogil $100,000, which was invested with Johnson. Johnson gave Cogil a Ridge note for this amount along with an agreement that the return would not be less than $56,000. Gilliam, for Cogil, endorsed the note to Mower and sent him a letter advising that the return would not be less than $45,000. Again, he did not assign the $56,000 agreement to Mower.

Mower never recovered the money from either investment, and after Johnson's fraud was discovered, he brought this suit. He was subsequently adjudicated a bankrupt, and his trustee in bankruptcy was substituted as the plaintiff. Mower's creditors include people who invested in the wine scheme through him.

## II

The district court held that the notes Mower received are securities as defined by § 2(1) of the 1933 Act, 15 U.S.C. § 77b(1). Both the law and the facts justify this ruling. In *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), the Court, reviewing its decisions that have examined the statutory definition of a security, said: "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Mower received the Ridge notes in return for the capital he furnished with the expectation of receiving profits earned by Johnson's entrepreneurial efforts.

## III

Section 12(1) imposes liability on any person who "offers or sells" securities in violation of the registration provisions of the Act. These terms are defined in § 2(3) of the Act, 15 U.S.C. § 77b(3):

The term . . . "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term . . . "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

These definitions include as sellers or offerors all persons whose actions are a substantial factor in causing a purchaser to buy a security. *Lewis v. Walston & Co.*, 487 F.2d

617, 621–22 (5th Cir. 1973). It is unnecessary to show that the offeror or seller owns the security, for the definition encompasses any significant participation in the sale on behalf of the actual owner. Liability may be imposed on any person who actively solicits an order, participates in the negotiations, or arranges the sale. *Lewis v. Walston & Co., supra,* 487 F.2d at 622; *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 692–93 (5th Cir. 1971); *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1052–53 (2d Cir. 1969). Consequently, a broker cannot escape liability simply because he acts in a dual capacity as agent for both the buyer and seller. *Cady v. Murphy,* 113 F.2d 988, 990–91 (1st Cir. 1940).

■ In contrast, the definition excludes persons who execute an unsolicited order or whose minor role in the transaction shows that they have no causal connection with it. *Katz v. Amos Treat & Co., supra,* 411 F.2d at 1053; *Canizaro v. Kohlmeyer & Co.,* 370 F.Supp. 282, 286–88 (E.D.La.1974), *aff'd* 512 F.2d 484 (5th Cir. 1975); *See generally* III L. Loss, Securities Regulation 1712–20 (2d ed. 1961). The status of Cocke and Gilliam must be determined by these principles.

Cocke and Gilliam protest that they were not offerers or sellers of the Ridge notes to Mower. They contend that they merely acted as Mower's agent in executing an unsolicited order. They deny that there was any causal connection between their conduct and Mower's loss, and they assert that Mower was determined to invest in Johnson's business regardless of their efforts.

It was Cocke who described himself as a "limited partner" in Johnson's venture. Moreover, he acknowledged that Johnson's request for help in raising money was essentially a proposition to make him "a general partner," and it was on this basis that he suggested bringing Gilliam into the enterprise. Complying with Johnson's request, Cocke and Gilliam solicited more than $1,000,000 from a number of investors.

It is unnecessary to find that Johnson's proposition to make Cocke and Gilliam "general partners under him" was actually consummated. Their efforts to raise money for Johnson establish that they were not disinterested brokers executing unsolicited orders for their clients. On the contrary they became part and parcel of Johnson's money-raising apparatus. It was in this capacity that they dealt with Mower.

When Mower contacted Gilliam he had no intention of channeling his investments through him. He simply wanted an introduction to Johnson so he could deal directly without paying commissions to an intermediary. Had Cocke and Gilliam acceded to Mower's request and done nothing more, they probably would not be considered offerors or sellers within the meaning of the Act. *Cf. Canizaro v. Kohlmeyer & Co.,* 370 F.Supp. 282 (E.D.La.1974), *aff'd* 512 F.2d 484 (5th Cir. 1975). But Cocke and Gilliam rejected Mower's request. Instead, they made a counter offer that assured him a higher return than his attorney provided and satisfied his request for notes evidencing his indebtedness. Moreover, the Ridge notes he received were payable in one instance to Cocke and in the other to Cogil, and on both occasions Cocke and Gilliam did not charge a simple commission. On the contrary, they profited from the transactions by their private agreements with Johnson.

■ These facts establish that the activity of Cocke and Gilliam falls within the Act's definition of "sell" and "offer." They were not simply brokers or a buyer's agents executing or assisting in placing an unsolicited order to purchase the notes. Through their counter offer, they solicited investments in Johnson's behalf anticipating a share of the profits in place of a broker's commission. Their activity—intended to benefit both themselves and Johnson—was a substantial factor in causing Mower to acquire the two Ridge notes on which the trustee seeks recovery.

We therefore conclude that Cocke and Gilliam offered and sold securities to Mower within the meaning of § 12 of the Act.

## IV

Section 4(2) provides that the registration requirements of the Act shall not apply to "transactions by an issuer not involving any public offering." The district court applied this exemption to Mower's purchases from Cocke and Gilliam and exonerated them from liability under § 12(1) of the Act. The court concluded that these transactions did not entail a public offering because it found that Mower, Cocke, and Gilliam were equally capable of fending for themselves, that they were equally experienced and able to check Johnson's scheme, and that Cocke and Gilliam did not withhold from Mower any information about the wine that was unavailable to him. The district court also held that the notes Johnson issued to Mower were isolated transactions and not an integral part of Johnson's arrangements with other investors. We believe that the reasons assigned by the district court are insufficient to exempt the transactions from the Act's registration requirements.

The Supreme Court defined the scope of the private offering exemption in *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), which dealt with a corporation's sale of its own stock to its employees. After observing that "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering,'" 346 U.S. at 125, 73 S.Ct. at 984, the Court provided a standard for determining which investors fall in this category. It ruled that an essential requirement is access to the kind of information that registration would disclose. Denying the exemption, the Court said:

> The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees [of Ralston Purina Co.] here were not shown to have access to the kind of information which registration would disclose. 346 U.S. at 127, 73 S.Ct. at 985.

The undisputed evidence establishes that Mower did not have access to the kind of information a registration statement would have disclosed. Registration would have required Johnson to provide detailed information concerning his wine business including copies of contracts, a balance sheet, a profit and loss statement, the identity of his other partners, and the specific purpose for which the funds being invested were to be used. *See* 15 U.S.C. § 77aa. In short, a registration statement would have exposed Johnson's fraud, but none was filed.

Cocke and Gilliam insist, however, that the *Ralston Purina* test is inapplicable because it assumes that the registration would be truthful. Such a supposition in this case, they say, would be absurd in light of Johnson's conduct.

■ Cocke and Gilliam cite no authority for their argument, and we are not persuaded that it presents a sound reason for allowing the private offering exemption of § 4(2). Exempting an issuer of fraudulent securities from registration because he probably would provide false data places a premium on fraud and defeats the purpose of the Act.

Cocke and Gilliam also claim that a number of other factors justify the private issue exemption. They emphasize that Mower was a sophisticated businessman who had successfully invested through his attorney with Johnson long before he had any dealings with them. They point out that he was determined to continue investing with Johnson through one avenue or another.

■ Essentially the same argument was advanced and rejected in *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678 (4th Cir. 1967). There we said:

> Appellants argue that the District Court erred in finding that the individual purchasers were not able "to fend for themselves," noting that they were "sophisticated investors" and "businessmen of mature experience." But "sophistication" is not a substitute for "access to the kind of information which registration would disclose." 346 U.S. at 127, 73 S.Ct. at 985. Schedule A of the Securities Act, 15 U.S.C. § 77aa (1958), lists 32 categories of information that should be included in a registration statement. This type of

information is designed to protect the investor by furnishing him with detailed knowledge of the company and its affairs to make possible an informed investment decision. A purchaser of unregistered stock must be shown to have been in a position to acquire similar information about the issuer.

The same point was recently emphasized in *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 902 (5th Cir. 1977), where the court recognized that the plaintiff was a sophisticated investor in petroleum ventures. It noted that he had a degree in petroleum engineering and that his holdings in approximately 26 oil and gas properties were valued at more than three quarters of a million dollars. Commenting on this aspect of the case the court said:

> Nevertheless, evidence of a high degree of business or legal sophistication on the part of all offerees does not suffice to bring the offering within the private placement exemption. We clearly established that proposition in *Hill York Corp. v. American International Franchises, Inc.*, . . . We reasoned that "if the plaintiffs did not possess the information requisite for a registration statement, they could not bring their sophisticated knowledge of business affairs to bear in deciding whether or not to invest . . ."

In short, there must be sufficient basis of accurate information upon which the sophisticated investor may exercise his skills. Just as a scientist cannot be without his specimens, so the shrewdest investor's acuity will be blunted without specifications about the issuer. For an investor to be invested with exemptive status he must have the required data for judgment.

We therefore conclude that Mower's business acumen, his favorable experience with Johnson, and his continued eagerness to invest do not supplant his lack of access to the information that a registration statement would show.

The district court assigned the uniqueness of Mower's investment as a supplementary reason for considering the transaction to be a private offering. It noted that "Johnson had myriad arrangements with his various investors, each designed to satisfy the demands of those particular investors." The court reasoned that the sale of two unique notes to a single investor demonstrated that the transaction was not a public offering.

██ In *Ralston Purina, supra,* the Court explained that the number of offerees does not determine the availability of the private offering exemption. It stated that "the statute would seem to apply to a 'public offering' whether to few or many," 346 U.S. at 125, 73 S.Ct. at 984, and it referred to the dictum that "[a]nything from two to infinity may serve: perhaps even one, if he is intended to be the first of a series of subscribers, but makes further proceedings needless by himself subscribing the whole." 346 U.S. at 125, n.11, 73 S.Ct. at 985. Therefore, the number of offerees is not a decisive means of determining the public or private nature of an offering, even though it can have a bearing on the likelihood of the offerees to have had access to the kind of information registration would disclose. *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 901 (5th Cir. 1977); *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 679 (4th Cir. 1967); *Gilligan, Will & Co. v. S.E.C.*, 267 F.2d 461, 467 (2d Cir. 1959).

The emphasis that courts have uniformly placed on the need for information rather than the number of subscribers furthers the purpose of the Act. That purpose, as expressed in its preamble, is "[t]o provide full and fair disclosure of the character of securities, . . . and to prevent frauds in the sale thereof . . . ." Securities Act of 1933, ch. 38, Tit. I, 48 Stat. 74 (1933). The need for protection against fraud is dramatically illustrated by the success of Johnson's scheme, in which 100 investors lost approximately $21,000,000. Many of these investors received Ridge notes, the type of security issued to Mower. It would be incongruous for that scheme to be considered outside the scope of the Act because the details of each investor's arrangement with Johnson varied. Such a result would

deny the Act's protection where it is most needed.

The burden of proving entitlement to the private offering exemption is on Cocke and Gilliam. *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Gilligan, Will & Co. v. S.E.C.,* 267 F.2d 461, 467 (2d Cir. 1959). They failed to carry this burden because they could not show that Mower had "access to the kind of information which registration would disclose." *S.E.C. v. Ralston Purina Co., supra,* 346 U.S. at 127, 73 S.Ct. at 985. The district court erred by applying an impermissible legal standard for determining whether the offering was public when it ruled that Mower could fend for himself although the evidence disclosed that he did not have access to the information a registration statement would provide. Therefore its ruling that the securities were privately issued must be set aside. *Cf. Doran v. Petroleum Management Corp.,* 545 F.2d 893, 905–06 (5th Cir. 1977). The exemption from registration afforded by § 4(2) is not available to Cocke and Gilliam, and consequently they are not entitled to judgment on the basis of this affirmative defense.

### V

The district court suggested that equitable defenses afforded an alternative ground for ruling in favor of Cocke and Gilliam. It found that Mower occupied a dual status: with respect to Cocke and Gilliam, he was an investor; with respect to the people from whom he solicited funds for investment, he was a promoter. Though the court disclaimed any intention of charging Mower with wrongdoing,[2] it nevertheless indicated that were it not for the disposition of the case on other grounds, Mower would be barred from recovery by the defenses of unclean hands and in pari delicto.

Cocke and Gilliam urge affirmance of the district court's conditional ruling about the

equitable defenses or, alternatively, a remand for a more definitive expression of the district court's views. We find no need for remanding the case. The district court considered all the relevant facts, and the applicability of these defenses raises largely a question of law.

A judgment based on the 1933 Act performs a dual function. It redresses a private wrong and enforces public policy. Since one of the essential purposes of the Act is to protect investors by requiring publication of information about a security through its registration, enforcement of the Act by private litigation ordinarily should not be encumbered by defenses for which the statute makes no provision. *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U.S. 38, 40, and 43–44, n.2, 61 S.Ct. 414, 85 L.Ed. 500 (1941); *cf. Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (Sherman Act); *see* III & VI L. Loss, Securities Regulation, 1692–95 (2d ed. 1961), 3828–30 (Supp.1969); R. Rapp, Expanded Liability Under Section 12 of the Securities Act: When Is a Seller Not a Seller? 27 Case W.Res.L.Rev. 445 (1977).

In *A. C. Frost, supra,* the Court held that a contract for the delivery of stock was enforceable. It refused to permit the offending issuer to assert that the contract was void because the stock had not been registered as required by the Act. The Court explained that under the circumstances, such a defense would "hinder rather than aid the real purpose of the statute." 312 U.S. at 43, 61 S.Ct. at 417. In reaching this conclusion the Court relied in part on an amicus brief from the S.E.C. which said:

"It appears to us to be entirely immaterial whether in such a case, the agreement is labelled 'void' or the parties are held to be 'in pari delicto.' There, labels, as often is the case, merely state the conclusion reached, but do not aid in solution of the problem. The ultimate issue

2. In note 28 of its opinion, the district court said:

We cannot emphasize too strongly that the Court makes no intimation whatsoever that

Mower in any way violated any federal or state securities law or rule or is in any way liable to any person not a party to this suit because of these transactions.

**1292**

is whether the result in the particular case would effectuate or frustrate the purposes of the Act." 312 U.S. at 44 n.2, 61 S.Ct. at 417.

In the leading case sustaining the defenses of unclean hands and in pari delicto, *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969), Judge Aldrich, addressing the discretion of the trial judge to allow such defenses, said:

> The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public. . . . Common law technicalities are to be avoided, . . . not merely in judging the plaintiff's claim but also in assessing defendant's responses.

The Fifth Circuit has formulated the following test for determining whether the defense of in pari delicto should be allowed in securities cases:

> (1) the fault of the parties must be "clearly mutual, simultaneous, and relatively equal;" and
> (2) the effect on the investing public or on the implementation of important features of the regulatory scheme must be so small as to permit the Court to conclude that allowing the defense would not interfere with [regulatory] objectives.[3]

This test is in essence a restatement of the principles found in a number of cases on the subject. Both elements of the test must be satisfied for the defense to be allowed. We believe that Cocke and Gilliam do not meet either of its requirements.

The first element of the test primarily concerns the application of the in pari delicto doctrine to the private aspects of securities litigation. It deals generally with parties whose equal, mutual, and simultaneous fault casts them in the role of joint conspirators. The defense has been allowed to bar an action by a tippee against a tipper, both

violators of § 10(b) of the 1934 Act [15 U.S.C. § 78j(b)] and Rule 10b(5) [17 C.F.R. § 240.10b–5 (1975)]. *See, e. g., Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152 (3d Cir. 1977); *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (5th Cir. 1969); *contra Nathanson v. Weis, Voisin, Cannon, Inc.*, 325 F.Supp. 50 (S.D.N.Y.1971). The defense has also been allowed when the plaintiff was an active participant in a fraudulent transaction. *See, e. g., Malamphy v. Real-Tex Enterprises, Inc.*, 527 F.2d 978 (4th Cir. 1975); *James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974). The *Kuehnert* and *Tarasi* courts observed that tippee suits are questions of "accounting between joint conspirators." 412 F.2d at 703; 555 F.2d at 1160.[4] The same theme was emphasized in *DuBreuil* where the court explained that it did not "serve as referee in an accounting between coconspirators." 500 F.2d at 160.

▆ In contrast, Mower, Cocke, and Gilliam were not confederates. None of them knew Johnson's scheme was fraudulent; they did not conspire to deceive other investors. Indeed, Cocke and Gilliam have steadfastly maintained that they did not collaborate with Mower in any way. "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 153, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring and dissenting). The disavowal of cooperation with Mower by Cocke and Gilliam in itself demonstrates that the defense of in pari delicto is inappropriate.

▆ The evidence discloses that Mower's offerings of unregistered securities were independent of those made by Cocke and Gilliam. Most of Mower's solicitations of investments occurred when he was transmitting funds through his attorney, and these transgressions had nothing to do with Cocke and Gilliam or the Ridge notes they furnished him. The district court found that in return for money he collected,

---

3. *Fogarty v. Security Trust Co.*, 532 F.2d 1029, 1033 (5th Cir. 1976).

4. For citations to several other cases and to commentaries dealing with the applicability of

the in pari delicto doctrine to private suits brought under the securities laws, *see Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1159 nn. 29 & 32 (3d Cir. 1977).

Mower gave the investors his post-dated check for the principal they invested plus their anticipated rate of return, usually between 40–50%. The check was offered and intended as Mower's personal guarantee. In some instances, if required by the investors, Mower gave promissory notes for the principal plus anticipated return. Mower also gave some people who invested with him a document resembling a stock certificate as a written confirmation of their investment. There is no evidence that Mower offered investors Ridge notes or any other type of security issued by Johnson. Moreover, Mower's practice of giving his personal guarantee to those who invested through him is in sharp contrast to the methods of Cocke and Gilliam who assiduously attempted to avoid personal liability. This evidence demonstrates that the defense is inappropriate, for proof of independent violations of the same regulatory act does not provide a sufficient basis for invoking the doctrine of in pari delicto. *Kiefer-Stewart Co. v. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). We therefore conclude that Cocke and Gilliam have not established that Mower's fault was "clearly mutual, simultaneous, and relatively equal" to their conduct.

Turning to the second element of the test dealing with the application of the defense of in pari delicto, we conclude that allowing the defense would interfere with the regulatory objectives of the 1933 Act. As we have previously noted, one purpose of the Act is to protect investors by requiring publication of information through registration before the securities are offered for sale. See *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40, 61 S.Ct. 414, 85 L.Ed. 500 (1941). Since unregistered offerings such as Johnson's do not generally attract the attention of regulatory agencies before sale, private suits play a particularly important role in the enforcement of the registration requirement. "[I]n many instances, particularly those involving relatively small distributions, the private suit is the only effective means of detecting and deterring wrongdoing on the part of issuers and their agents or underwriters who have not registered the securities being offered for sale." *Woolf v. S. D. Cohn & Co.*, 515 F.2d 591, 605, *rehearing denied*, 521 F.2d 225 (5th Cir. 1975), *vacated and remanded on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

The deterrent effect of private suits would be seriously eroded by the defense of in pari delicto. Persons at or near the beginning of the chain of distribution who deal with relatively few people would be virtually immune from liability, especially in those circumstances where the requirement of privity of contract foreclosed suit.[5] Thus, persons such as Johnson, Cocke, and Gilliam would escape liability under § 12(1) simply because their vendees also sold some unregistered securities in violation of the Act. To be sure, promoters who are lower on the chain of distribution should also be deterred from violating the Act, but allowing the defense of in pari delicto against them is not the only means of achieving this end.[6] Mower and people similarly situated who act in the dual capacity of buyers and sellers can be deterred by allowing recovery in suits brought by their vendees.

In sum, the enforcement of § 12(1) usually can be best promoted within the

---

5. A commentator has observed: "Subject to these exceptions involving controlling persons and agents, it seems quite clear that § 12 contemplates only an action by a buyer against *his immediate seller.*" III L. Loss, Securities Regulation 1719 (1961). Recently, however, criticism of the narrow view of privity has emerged. *See generally* R. Rapp, Expanded Liability Under Section 12 of the Securities Act: When Is a Seller Not a Seller? 27 Case W.Res.L.Rev. 445 (1977).

Investors in Johnson's wine scheme who dealt directly with Mower were unsuccessful in attempting to recover their losses from Cocke and Gilliam. *See Bauer v. Gilliam*, 551 F.2d 304 (4th Cir. 1977).

6. It has been suggested that imposing a constructive trust on any recovery by a plaintiff who has himself violated the securities laws could serve as a substitute for the defense of in pari delicto. *See Wolf v. Frank*, 477 F.2d 467, 474–75 (5th Cir. 1973) (dictum); D. Dobbs, Remedies 1002 (1973). In practical effect, recovery by Lawler, trustee in bankruptcy, will create the equivalent of such a trust. At least

present framework of the law by allowing each purchaser in the chain of distribution to pursue an action against his seller. These considerations of public policy, though not always fully articulated, have impelled a number of courts to deny defendants the right to assert the defense of in pari delicto against claims based on § 12(1). *See, e. g. Wassel v. Eglowsky*, 399 F.Supp. 1330, 1365 (D.Md.1975), *aff'd* 542 F.2d 1235 (4th Cir. 1976); *Woolf v. S. D. Cohn & Co.*, 515 F.2d 591, *rehearing denied*, 521 F.2d 225 (5th Cir. 1975), *vacated and remanded on other grounds*, 426 U.S. 944, 96 S.Ct. 1361, 49 L.Ed.2d 1181 (1976); *Henderson v. Hayden, Stone, Inc.*, 461 F.2d 1069, 1072 (5th Cir. 1972); *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1054 (2d Cir. 1969); *Can-Am Petroleum Co. v. Beck*, 331 F.2d 371, 373–74 (10th Cir. 1964).

Although these cases do not differ in principle from the case before us, the facts in most of them are understandably dissimilar. One case, however, bears a marked resemblance. In *Can-Am Petroleum Co. v. Beck*, 331 F.2d 371 (10th Cir. 1964), the plaintiff purchased unregistered securities representing an $^{11}/_{32}$ share in an oil and gas lease. In addition, she became actively involved in promoting the securities and successfully urged others to invest in them. For these efforts, she received an additional $^{1}/_{16}$ interest in the leasehold. Nevertheless, the court concluded that public policy dictated that the defense of in pari delicto should not bar her recovery.

Cocke and Gilliam are unable to meet both requirements of the Fifth Circuit's test. Since failure to satisfy either element of the test is sufficient to bar recovery, they cannot escape liability by the defense of in pari delicto.

■ Much of our discussion about in pari delicto applies to the defense of unclean

hands; sometimes, the two concepts are considered to be interchangeable. There is, however, an additional reason for not allowing the traditional doctrine of unclean hands to bar Mower's claim. This defense, as Pomeroy explains, requires the defendant to show that he himself has been injured by the plaintiff's conduct.[7] Cocke and Gilliam did not prove that Mower harmed them. The only wrong he committed was against third parties.

We therefore conclude that the judgment of the district court must be reversed and that judgment should be entered in favor of Lawler, trustee in bankruptcy for Mower's estate. The case is remanded for further proceedings consistent with this opinion.

*Reversed and Remanded.*

---

part of any sums recovered will become available to Mower's creditors who invested in the wine scheme through him. Apparently Mower will not share in the recovery.

7.  J. Pomeroy, A Treatise on Equity Jurisprudence § 399 says in part:
    The party to a suit, complaining that his opponent is in court with "unclean hands"

because of the latter's conduct in the transaction out of which the litigations arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. The wrong must have been done to the defendant himself and not to some third party.