**The SOUTH CAROLINA NATIONAL BANK, Plaintiff,**

v.

**Virginia L. DARMSTADTER, Defendant.**

Civ. A. No. 6:84–2466–14.

United States District Court, D. South Carolina, Greenville Division.

Nov. 18, 1985.

Jennings L. Graves, Jr., Love, Thornton, Arnold & Thomason, Greenville, S.C., for plaintiff.

James R. Gilreath, Greenville, S.C., for defendant.

ORDER

WILKINS, District Judge.

This matter is before the Court upon the parties' motions for summary judgment.

For the reasons set forth below, the Court finds that the December 1978 loan transaction between the parties does not involve or constitute a security. Further, the Court finds that Plaintiff was not a responsible party in the transaction between Defendant and the National Railway Utilization Corporation (NRUC) in that Plaintiff did not breach any fiduciary duty owed Defendant. Accordingly, Plaintiff's motion for summary judgment on these issues is granted. The remaining issues contained in Plaintiff's motion and Defendant's motion for summary judgment are denied.

The threshold question to be addressed is whether the loan of Plaintiff, The South Carolina National Bank (SCN), to Defendant and the receipt by SCN of a secured note from Defendant in December 1978 constitute a security. If the secured note received by SCN in exchange for the loan, in the context of the overall transaction, and in the context of the intent of the federal and state securities laws, is a security, additional questions would arise; but if the loan transaction does not involve a security, the Court need not further consider Defendant's allegations of securities violations. A related question which must be addressed, although summarily, is whether SCN's financing of Defendant's investment transaction with NRUC implicates SCN in the issuance, sale or purchase of a security by NRUC. If the loan transaction does not involve a security, the remaining issues for the Court are Defendant's allegations of breach of fiduciary duty and the amount of damages, if any, due the prevailing party.

### FINDINGS OF FACT

The transaction in question originated December 27, 1978 when Defendant purchased two railroad boxcars pursuant to a business venture with NRUC. Defendant financed the purchase price by receiving a secured loan from SCN, and SCN secured the loan with the assets purchased and all of Defendant's rights arising thereunder. An earlier identical transaction occurred in June 1978.

During 1978 NRUC was engaged in, among other things, the business of supplying and managing general purpose railroad boxcars for its own account and for others to be used in the railroad interchange system. NRUC was and continues to be a common carrier subject to regulation by the Interstate Commerce Commission. NRUC's corporate headquarters and executive offices were and are located in Philadelphia, Pennsylvania. In December 1978 Defendant was the eighth largest stockholder in NRUC. Defendant was employed as the director of the Washington, D.C. office of NRUC in September 1977.

During 1977 the concept of the sale of railroad boxcars to individual owners and the management of those boxcars by NRUC originated within the management of NRUC. As the development of the managed boxcar concept progressed, certain members of NRUC management realized that an investment in boxcars to be managed by NRUC might be an attractive fringe benefit for NRUC management, stockholders and other insiders. However, during the period of 1977 and 1978, the demand for boxcars far exceeded the supply and the number of boxcars available for purchase by what came to be known as the "management group" was limited.

Defendant attacks the loan transactions which accompanied the sales of boxcars to Defendant and other members of the management group in June and December of 1978, but attempts to escape liability under only the December 1978 note. The sales transactions involved duplicate sets of documents, which included a Secured Note, Security Agreement, Agency Agreement, and Management Agreement. Several members of the management group negotiated the terms of the purchases and of the management of the boxcars and also arranged for loans for individual members of the management group from commercial lenders. SCN was one of several lenders approached regarding loans and at least one other bank was prepared to make loans to the management group. At the time that the participating members of the management group were chosen, no lender

had been selected. It is clear that the impetus for the loan transactions came from Defendant's fellow members of the management group, and not from SCN. It is also clear that the terms of the loans were negotiated on behalf of the individual members of the management group by fellow members of the management group.

Likewise, the purchases of the boxcars, including the price, and the terms of the Management Agreement, including management duties and management and maintenance fees, between NRUC and the purchasers, were negotiated directly between NRUC and the management group thereof. NRUC and the management group determined that the revenues earned by the boxcars should be pooled in order to provide each of the members of the management group with equal treatment. The Management Agreement also provided that any member of the management group could elect to withdraw from the pooling arrangement at any time. Further, the agreement provided that the management and maintenance fees payable to NRUC would not be paid if revenues were insufficient to first pay the loan installments to SCN. SCN did not establish the terms of the purchase and management documents between the individual members of the management group and NRUC. SCN's involvement in the overall transaction was limited to the structuring of the financing of the transaction and the documents establishing and/or affecting the financing.

SCN loaned the individual members of the management group 90% of the purchase prices of the boxcars. As a secured lender, SCN participated in the structure of the loans and collateral documents. SCN required that each of its loans be collateralized and took security interests in the boxcars purchased, and in the revenues generated by the boxcars and the individual borrowers' contract rights under the Management Agreement with NRUC. The Court is aware that commercial lenders often play an active role in the determination of the terms of any loan documentation and in the terms of collateral documentation, with particular concern toward protection of the lender's position. The participation of SCN in the loan transactions herein demonstrates that it, to the extent that the superior bargaining power of any lender allows, dictated the terms of the notes and related agreements, including specific terms concerning the collateral.

The Secured Note issued by Defendant to SCN in exchange for the loan from SCN provided for a fixed principal amount, interest fixed at the rate of 12% per annum, fixed periodic principal and interest payments, and a fixed balloon payment in July 1984. The note and security agreement also provided for standard default terms, for acceleration in the event of default and for attorney's fees and costs of collection in the event that legal action was necessary. SCN further required that its collateral be properly insured and required financial statements from the borrowers prior to the closing of the loan transactions, and on an annual basis thereafter. SCN made a determination that certain of the borrowers in the management group were required to provide additional collateral, in addition to the boxcars and the proceeds of the boxcars. The note further provided that the borrower could prepay the note in full anytime upon the payment of a prepayment fee amounting to 3% of the then outstanding loan balance.

The Agency Agreement between each individual borrower and the SCN Trust Department provided that NRUC, once it allocated the revenues to the individual boxcar owners, would pay the net revenues to the SCN Trust Department and further provided that the SCN Trust Department would, to the extent that funds were available in the account of each individual borrower, make the quarterly principal and interest payments to the SCN commercial loan department. Any excess revenues were to be invested in a consumer passbook savings account for the benefit of each investor, and were to be retained in the savings account until the loan was paid in full. Each individual borrower was to be responsible, however, for any deficiency in the

quarterly principal and interest payments. SCN therefore acted as an escrow agent for the collection of revenues, application thereof to the debt and retention of excess revenues. SCN received a deposit of $4,000.00 per boxcar toward the purchase of each boxcar.

A careful review of the Secured Note of Defendant demonstrates that the quarterly principal and interest payments were determined on the basis of a 12–year amortization schedule and that the full remaining balance on the note was due to SCN five and one-half years after funding. Obviously, there would remain a substantial balloon payment due at maturity of the Secured Note, and SCN required as security for the full amount of the note that the revenues generated by the boxcars, to the extent that the revenues exceeded the quarterly principal and interest payments, be retained in an escrow savings account. While this feature may not accompany every commercial loan, it is consistent with SCN's desire to be as fully protected as possible, particularly in light of the balloon payment feature of the note. Defendant contends that this structure evidences the intent by SCN to participate in the profits to be derived solely from the efforts of others, but logic and common sense dictate that such was more likely the action of a prudent lender attempting to protect its loan repayment as securely as practicably possible. Other than rights to its collateral and to repayment in accordance with the terms of the financing documents, SCN had no right to control NRUC or Defendant and had no right to share in the profits of either.

Further, there is no evidence of any role played by SCN in inducing Defendant to purchase the boxcars.

## CONCLUSIONS OF LAW

The definitions of "security" under the Securities Act of 1933, 15 U.S.C.A. § 77b(1) (West Supp.1985), and the Securities Exchange Act of 1934, 15 U.S.C.A. § 78c(a)(10) (West Supp.1985), as well as under the South Carolina Blue Sky Laws, S.C.CODE ANN. § 35–1–20(12) (Law.Co-op. 1976 & Supp.1984), are essentially identical and provide that the term "security" includes any note unless the context otherwise requires.

Where the South Carolina securities law is substantially identical to the federal provisions, South Carolina courts will ordinarily follow the federal court's interpretations of federal securities laws. *Bradley v. Hullander*, 272 S.C. 6, 249 S.E.2d 486, 494 (1978). Since South Carolina courts have not construed the term "security" and the term "note" within the context of a security, a discussion must necessarily deal with the federal securities laws.

The Fourth Circuit Court of Appeals utilized the following definition in determining whether a note constituted a security in *Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir.1978):

> In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 [95 S.Ct. 2051, 2060, 44 L.Ed.2d 621] (1975), the Court, reviewing its decisions that have examined the statutory definition of a security, said: "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

Although the Fourth Circuit has yet to characterize the test it uses in considering the constitution of a "security," this language indicates that the Fourth Circuit would adopt the "commercial vs. investment" test employed by the First, Third, Fifth, Seventh and Eleventh Circuits. *Oliver v. Bostetter*, 426 F.Supp. 1082, 1085 (D.Md.1977). Factors to consider in determining whether a given commercial instrument constitutes a security include:

> [T]he size of the offering; whether there is, by necessity, reliance on the expertise of the issuer; the purpose of the issuer in executing the note and the payee in accepting the note; and the economic inducements held out to the prospect[;] ... the degree to which the profit on the note is in the hands of the maker rather

than the payee; whether the object of the holder was to acquire an interest in the property or enterprise; whether the note was primarily commercial because it was serving as a "cash substitute" for the purchase price; and whether the return on the note was predetermined or could reasonably be anticipated, or was subject to the managerial efforts of the maker.

*Futura Development Corp. v. Centex Corp.*, 761 F.2d 33, 41 (1st Cir.1985). All of these factors should be considered in their combined effect to determine the constitution of a particular transaction. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 432 (9th Cir. 1978).

■ The facts of this case establish that the loan transactions did not constitute or involve securities. First, Defendant could have obtained alternative financing for the purchases or could have paid for the boxcars in cash. Second, the notes herein were issued by Defendant within the context of a commercial loan transaction and not within the context of a "purchase" of a security by SCN. The loan was represented by a promissory note and related documents, providing SCN with collateral in all of Defendant's rights in the assets purchased, including the right to income earned by the assets. The note was for a fixed sum and provided for interest at a fixed rate and for payments in fixed amounts and at fixed dates. It contained standard default provisions, including the right to accelerate the due date of payments upon default, and to pursue the borrower and the collateral in the event of default. SCN's requirement that it retain any excess revenues during the term of the note was reasonable within the context of the security concerns of a commercial lender, given the balloon payment feature of the note. Moreover, the note provided that Defendant could prepay the debt at any time, thereby avoiding the requirement that SCN hold any excess revenues earned.

Further, SCN did not look to the managerial or entrepreneurial abilities of NRUC

or to the success of Defendant's investment for repayment. It analyzed the credit position of Defendant prior to the loan transaction and determined that she had sufficient assets for repayment of the loan, aside from her purchase of the boxcars. Defendant was also specifically responsible for any deficiency in the quarterly payments.

The facts that SCN could potentially use any excess revenues it held in its passbook savings account for bank purposes and that SCN received a fee for its escrow functions does not turn this otherwise commercial loan into an investment by SCN. Every loan transaction, savings account system, or banking function of a commercial bank constitutes a form of investment, in that the bank will receive some form of profit or remuneration in return for its services, such as interest, the use of funds deposited, or fees. *See Futura Development Corp. v. Centex Corp.*, 761 F.2d at 41–42; *Thorp Commercial Corp. v. Northgate Industries, Inc.*, 1974–1975 Fed.Sec.L.Rep. (CCH) ¶ 94, 929. In the present case SCN's right to the interest earned or to the use of any funds on deposit was subject to the borrower's right to prepay the loan, thereby detracting from any investment purpose of SCN. The purpose of the present loan was to provide Defendant with the necessary funds to utilize in a business venture. SCN did not induce Defendant to undertake the venture, as SCN was not selected as the financing institution until after the decision to invest was made, SCN was one of several institutions considered, and Defendant was a majority shareholder of the corporation with which she entrusted her funds. SCN was not attempting to participate in the boxcar venture, as it merely supplied the cash for an investment and received tailor-made security in return therefor. Indeed, Defendant could have financed the transaction by the use of another lender or by the payment of cash. Last, regardless of whether the subordination of NRUC's fees was the result of SCN's demands or of NRUC's drafting, this factor when considered in the totality

of the circumstances does not render the loan transaction a security.

Several courts have addressed the issue of whether a note or loan transaction constitutes a security in factual situations somewhat similar to the one present here. One of these factual situations is found in *Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057, 1063 (6th Cir.1984). In *Davis,* the Sixth Circuit held, *inter alia,* that promissory notes executed to a finance company in the ordinary course of the finance company's business, the proceeds of which were to be used to pay for an investment in a "Dare to Be Great" pyramidal scheme, were not securities. Further, in *Amfac Mtg. Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d at 433, the court held, under a test somewhat different from that used in this circuit, that a promissory note and related security documents received by a finance company to finance the borrower's investment in the construction of a shopping center were not securities under the federal securities laws. The court recognized that federal securities laws do not afford relief when commercial ventures prove to be unwisely made. *Id.* at 428. *See also Futura Development Corp. v. Centex Corp.,* 761 F.2d at 38–42, *Thorp Commercial Corp. v. Northgate Industries, Inc.,* 1974–1975 Fed.Sec.L.Rep. (CCH) ¶ 94,929.

Further, the Fourth Circuit's opinion in *Lawler v. Gilliam,* 569 F.2d at 1287, is supportive of the conclusion that the present loan transaction did not involve or constitute a security. The Court in *Lawler* held, *inter alia,* that promissory notes issued by a business, in exchange for investments of money, which were accompanied by contracts guaranteeing a specific rate of return on the investment, and which were used as collateral for bank loans, constituted securities. Although not specifically addressed, the Court did not treat the bank loan transactions which provided the funds to invest as securities. Applying *Lawler* to the present case, the management agreement and related agreements which Defendant entered into with NRUC are analogous to the notes and guarantee contracts that the investor received in *Lawler,* as both constituted investments dependent upon the managerial skills of third parties, and both were used as collateral for bank loans. However, the bank loans providing the funds with which to invest were not treated as securities in *Lawler,* and are not securities in the present case. Accordingly, the Court finds that the loan transaction between SCN and Defendant did not constitute or involve a security as defined in state or federal securities laws.

Because the loan transaction accompanied a more complicated investment scheme, the Court must address SCN's involvement in the overall transaction between Defendant and NRUC. The Court finds that SCN is not liable as a participant in the sale of securities or investment contracts by NRUC to Defendant. Defendant's attempt to taint SCN with the characteristics of the transaction between Defendant and NRUC is unavailing. While the Court acknowledges that SCN necessarily became involved in the transaction between Defendant and NRUC to the extent necessary to fully document and protect its loans and collateral, there is no evidence that SCN thereby intended to be making an investment or that it took any steps to induce any investment by Defendant with NRUC. Defendant has overlooked the role played by her peers in the management group at NRUC and has attempted to blame SCN for her reliance upon her associates in the management group. Further, the Court notes that Defendant was a majority shareholder of the managing agent, NRUC, and that Defendant was an educated, sophisticated businessperson well within her area of business expertise. The securities laws were not intended to relieve sophisticated investors of ill-conceived investments.

In *Getz v. Central National Bank of Greencastle,* 147 Ind.App. 356, 261 N.E.2d 81, 85 (1970), the court ruled that the involvement of the bank, which was in many ways similar to SCN's position here, "did not constitute direct or indirect participation in the distribution" of an invest-

ment contract. This Court is persuaded by the conclusions drawn by the court in *Getz*, which, while it dealt with this issue as opposed to the issue of whether the note issued by the borrower to Central National Bank was a security, uses a similar approach in determining that the lender was not a participant in the distribution of an investment contract. In light of the court's finding that a commercial lender, by agreeing to perform its normal banking functions, cannot be classified as a participant in the sale of a security, the Court concludes that SCN's role in the overall transaction was that of a lender and not an investor or participant in the distribution of investment contracts or securities.

■ The Court must next address the Defendant's claims of breach of fiduciary duties. Defendant contends that SCN "agreed and purported to hold Defendant's equity and interest in the investment for the benefit of Defendant" and that SCN "had statutory and common law fiduciary duties to protect and promote Defendant's equity and interest in the investment on behalf of Defendant." (Answer and Counterclaim, ¶ 37.)

The Secured Note and the Security Agreement provided only for the provisions concerning the loan and collateral for the loan. The Court notes that the evidence submitted clearly shows that SCN fulfilled any fiduciary obligations which may have arisen under these documents, as SCN dealt fairly and responsibly in an arm's length loan transaction with a sophisticated borrower. The only duties of SCN, other than the duties of a secured lender, were set out in the Agency Agreement. The Court finds that the evidence clearly establishes that SCN fulfilled its duties under the Agency Agreement and that no breach of duty occurred thereunder. The materials submitted unquestionably establish that SCN did not breach any duties owed Defendant.

Accordingly, the Court grants Plaintiff's motion for summary judgment as to the issues of whether the December 1978 loan transaction constituted or involved a securi-

ty, whether SCN was a responsible participant of the overall transaction, and whether SCN breached any fiduciary duties owed Defendant. Plaintiff's other grounds and Defendant's motion for summary judgment are accordingly denied.

The Court will address the issue of damages in a later order. The parties are directed to file any submissions on the issue of the amount Plaintiff is due under the note no later than December 2, 1985.

AND IT IS SO ORDERED.